IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

IN THE MATTER OF THE SEARCH OF
INFORMATION CONTAINED IN A
CELLULAR TELEPHONE:

NAVY BLUE AND GREY IPHONE
(**DEVICE 1**)

Case No. ___2:24-cr-531_____

RED AND BLACK IPHONE (**DEVICE 2**)

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Alexander Blake, a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice, being first duly sworn, hereby depose and state under oath as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so employed since January of 2020. I have been a law enforcement officer for over 16 years and as such I have participated in a substantial number of complex investigations. I have participated in hundreds of search warrant executions and participated in countless arrests for violations of local, state, and federal crimes.

2.      In 2019, the FBI formed the Low Country Violent Crime Task Force (LCVCTF). The LCVCTF is an FBI led joint task force consisting of the FBI, South Carolina State Law Enforcement Division (SLED), the North Charleston Police Department (NCPD), the Charleston City Police Department (CPD), the Charleston County Sheriff's Office (CCSO), the Berkeley

County Sheriff's Office (BCSO) and the Mount Pleasant Police Department (MPPD). I am assigned to the LCVCTF and serve as one of the lead case Agents for LCVCTF investigations.

3.      During my training at the FBI Academy, Quantico, Virginia, I received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. I have advanced training in complex narcotics investigations, money laundering, sophisticated criminal interdiction techniques, and violent crime investigations.

4.      I have actively participated in various methods of investigation, including but not limited to, consensual monitoring, physical surveillance, interviews of witnesses and defendants, the use of search warrants, the use of pen registers, confidential human sources (CS), the use of intercepted and electronic communications, as well as social media exploitation relating to drug and firearms investigations.

5.      I have participated in numerous Title III investigations for the FBI that were utilized in major narcotics and gang investigations. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement. Additionally, I have received training, both formal and informal, in the operation of drug trafficking, money laundering, and wiretap investigations.

6.      With respect to investigations involving controlled substance violations, I have conducted investigations into the unlawful possession, importation, possession with intent to distribute, and distribution of controlled substances, and the associated conspiracies. Through both the experience I have from criminal investigations and the additional training I have received, I am familiar with the distribution methods used by controlled substance traffickers, including, but

not limited to, the methods of importing, packaging, transferring and distributing controlled substances; the use of cellular telephones, pagers, the use of numerical codes, code words and other methods of avoiding detection by law enforcement; the types and amounts of profits made by controlled substance traffickers; and the methods, language, and terms that are used to disguise the source and nature of the profits from their illegal controlled substance dealing.

7.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.      The property to be searched is a navy and grey iPhone (**Device 1**) and a black and red iPhone (**Device 2**). **Device 1** and **Device 2 (the Devices)** are currently located at the FBI Charleston Resident Agency, 1671 Belle Isle Avenue, Mount Pleasant, SC 29464.

9.      The applied-for warrant would authorize the forensic examination of **the Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

10.     Beginning in August of 2019, the FBI, Columbia Division, Charleston Resident Agency (CRA), South Carolina Law Enforcement Division (SLED), North Charleston Police Department, Summerville Police Department, Charleston Police Department, Charleston County Sheriff's Office (CSO) and the Colleton County Sheriff's Office (CCSO) have been investigating acts of violence and drug trafficking activities involving members and associates of the Get Money Cowboys Drug Trafficking Organization (GMC DTO).  These individuals are suspected of distributing cocaine, heroin, methamphetamine, marijuana, prescription medications, and other controlled substances.

11.     On September 5, 2023, United States District Judge Bruce H. Hendricks, District of South Carolina, issued an order authorizing the interception of wire communications to and from a cellular telephone bearing the number 843-908-4739, used by Trevor Fishburne (FISHBURNE), who has been identified as a leader of the GMC, as well as a supplier of controlled substances to the GMC. The interceptions were initiated on September 6, 2023.

12.     On September 10, 2023, Agents intercepted telephone conversations in which FISHBURNE directed his sister, Shaniya Brown (BROWN) to provide $41,000 in bulk currency to three Hispanic males. Through the investigation and wire interceptions, agents knew the $41,000 to be drug proceeds. Through investigative techniques, the Hispanic males were identified as Jesus Ramirez Guzman (GUZMAN), Rodolfo Aviles Reyes (REYES), and Ismael Ramos (RAMOS). GUZMAN, REYES, and RAMOS retrieved the $41,000 from BROWN in Walterboro, SC and traveled directly to an apartment located at 1512 Kippford Way, Unit 536, Myrtle Beach, SC. REYES was observed carrying the bag which contained the $41,000 into the apartment.

13.     On September 17, 2023, GUZMAN and at least one passenger picked up $18,000 from Jaden Smith (SMITH) in Walterboro, SC. Through intercepted conversations, Agents learned FISHBURNE directed SMITH to provide the bulk US currency to GUZMAN. GUZMAN and the unknown passenger(s) were followed until they reached I-95 northbound in Walterboro, SC, and surveillance was discontinued. Through the investigation and wire interceptions, agents knew the $18,000 to be drug proceeds.

14.     On October 5, 2024, GUZMAN and REYES picked up $17,232 from Jaziah Lewis (LEWIS) in St. George, SC. Through intercepted conversations, Agents learned LEWIS was directed to provide the bulk US currency to GUZMAN and REYES. Through the investigation and wire interceptions, agents knew the $17,323 to be drug proceeds.

15.    A traffic stop was conducted on the Dodge Ram 3500 in Myrtle Beach, SC in which GUZMAN and REYES were traveling. GUZMAN was identified as the driver and REYES was identified as the passenger. GUZMAN and REYES traveled directly to 115 Myrtle Ridge Drive, Myrtle Beach, SC (Wal-Mart) and were observed conducting wire transactions via Western Union. According to a Western Union subpoena return, GUZMAN wired $1,500 to JENNIFER VANESSA PORTILLO DE HERNANDEZ in Houston, Texas. According to a Western Union subpoena return, REYES wired $1,000 to ROSA MARIA CANUERO RAMIREZ in Houston, Texas.

16.    Through investigation, Agents determined GUZMAN sent thirty-two wire transfers (twenty-eight to Mexico, three to Houston, Texas, and one to Murrieta, California) from the Myrtle Beach, SC area between July 2, 2022, and December 10, 2023. The total for the wire transfers from the South Carolina area conducted by GUZMAN was $48,865. Agents additionally learned REYES sent eighteen wire transfers (thirteen to Mexico, four to Houston, Texas, and one to Brenham, Texas) from the Myrtle Beach, SC area between October 7, 2022, and December 9, 2023. The total for the wire transfers from the South Carolina area conducted by REYES was $25,725.

17.    Based on GUZMAN's conduct during the investigation, an arrest warrant was issued for GUZMAN by United States Magistrate Judge Molly Cherry, District of South Carolina, on May 15, 2024 for conspiracy to commit money laundering. On May 28, 2024, Agents of the LCVCTF, SLED, and Homeland Security Investigations (HSI) located GUZMAN at 1512 Kippford Way, Myrtle Beach, SC. GUZMAN was taken into custody and Mirandized by SA Blake. GUZMAN indicated he understood his Miranda Warnings and agreed to speak with Agents. GUZMAN indicated he was familiar with traveling to the Walterboro, SC area to retrieve a

quantity of bulk cash and he was familiar with completing the wire transfers to individuals in Mexico with some of the money which was collected. GUZMAN stated REYES directed him to pick up the bulk cash and conduct the wire transfers. GUZMAN had on his person at the time of the arrest, **Device 1**. GUZMAN provided his pin code to unlock **Device 1** and provided SA Blake permission to search the device. GUZMAN looked through the cellular phone with SA Blake and provided two known telephone numbers for REYES who, according to GUZMAN, was labeled as "Coyote" and "Coyote 2" in the cell phone. SA Blake conducted a cursory search of **Device 1** and noticed the WhatsApp application was installed on the device. SA Blake is familiar with individuals using WhatsApp to communicate regarding illegal activities due to the end-to-end encryption of the application. SA Blake conducted a cursory search of the WhatsApp application, in the presence of GUZMAN, and noticed a text message conversation between GUZMAN and an unlabeled number which contained numerous photographs of wire transfer receipts sent by GUZMAN. SA Blake ended the search of **Device 1** at this time.

18.    GUZMAN provided consent for Agents to conduct a search of his bedroom at 1512 Kippford Way, Apartment 536, Myrtle Beach, SC as well as a navy-blue Dodge Ram 3500 (PA Tag: ZRS 4816) which was being driven by GUZMAN. Located in GUZMAN's bedroom was **Device 2,** which GUZMAN identified as belonging to him. GUZMAN indicated **Device 2** was his old cellular phone and **Device 1** was his new cellular phone. Located within the Dodge Ram pickup truck were nine wire transfer receipts from GUZMAN, REYES, and an unknown individual to unknown people in Mexico, two PNC bank receipts, as well as W4 tax withholding paperwork for six individuals to include REYES and RAMOS.

19.    Your Affiant believes GUZMAN was using **Device 1** to communicate regarding the illegal acts which he was charged, as specifically detailed in paragraph 16 above. Your Affiant

believes GUZMAN was communicating with co-conspirators regarding arranging the pickups of bulk currency and the wiring of illegal funds to Mexico and other places throughout the United States. Your Affiant believes **Device 1** will additionally contain photographs of wire transfer receipts and potential locations which bulk currency was stored and/or retrieved from. Your Affiant believes GUZMAN was using **Device 2** prior to **Device 1** during this investigation and thus **Device 2** will contain similar evidence to **Device 1** of the illegal activities conducted by GUZMAN. Your Affiant believes **the Devices** contain information regarding the money laundering activities as well as other evidence which pertains to the investigation being conducted by the FBI into the GMC DTO.

20.     Your Affiant believes based on training, experience, and discussions with other investigators with experience in the subject matter, there is probable cause to believe that **the Devices** will contain evidence of violations of Title 21 U.S.C. § 841(a)(1), Title 21 U.S.C. § 843(b), Title 21 U.S.C. § 846, Title 18 U.S.C. § 1956(h), and Title 18 U.S.C. § 1957. Your affiant believes this information will assist in identifying other members of the criminal organization as well as criminal activity being committed by the GMC. There is probable cause to search **the Devices** based on the facts mentioned above.

## TECHNICAL TERMS

21.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of

transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable

storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.   Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a

keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

h.   Cloud Services: The device may utilize storage locations in addition to that of the physical memory chip within the device which may be removable or may be contained in "cloud" storage locations. The device accesses these locations or

devices via settings, options, and programming contained within the device itself, which results in the direct deposit or retrieval of data from these locations. Additionally, the common method of data backup for the device is through a cloud-based service which stores previous copies of the selected backup data for the accounts associated with the device.

22.    Based on my training, experience, and research I know that each Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, a PDA, and access to cloud based sources.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period on the device.  This information can sometimes be recovered with forensics tools.

24.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

26. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### <u>CONCLUSION</u>

27. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **the Devices** described in Attachment A to seek the items described in Attachment B.

This affidavit has been reviewed by Assistant United States Attorney Carra Henderson.

Respectfully submitted,

Alexander Blake
Special Agent
Federal Bureau of Investigation

SWORN TO ME VIA TELEPHONE OR
OTHER RELIABLE ELECTRONIC MEANS
AND SIGNED BY ME PURSUANT TO
FED. R. CRIM. P. 4.1 AND 4(d) OR 41(d)(3),
AS APPLICABLE

This __11th_ day of _____June_____, 2024
Charleston, South Carolina

The Honorable Mary Gordon Baker
UNITED STATES MAGISTRATE JUDGE